The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Garner and Glenn and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award. The Full Commission therefore affirms the Opinion and Award of the Deputy Commissioner with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all times relevant to this matter, an employer-employee relationship existed between decedent and defendant-employer.
3. Decedent was employed by Unarco at Marshville, NC, from October 1, 1949, until June 2, 1950.
4. Unarco was insured by American Mutual Liability, now insolvent, during the time of decedent's last employment with Unarco.
5. The North Carolina Insurance Guaranty Association ("NCIGA") became obligated to pay covered claims of Unarco pursuant to N.C. Gen. Stat. §97-133(4) as a result of American Mutual Liability filing for Chapter 11 Bankruptcy on January 17, 1989.
6. Decedent, Clonnie Thomas, was exposed to asbestos during his employment, as identified in Paragraph 1 of the Pre-Trial Agreement, at sufficient level and duration so as to satisfy the requirements set out in N.C. Gen. Stat. § 97-57.
7. The NCIGA is a proper party pursuant Deputy Commissioner Glenn's May 21, 1999, order:
 Now therefore it is hereby ordered that the addition of Union Asbestos and Rubber Company as a defendant to this workers' compensation claim was and is and shall be only for the sole and limited purpose of permitting Plaintiff to assert claims against entities other than Union Asbestos and Rubber Company and its successors, specifically including such other entities as American Mutual Insurance Company (now insolvent) and the North Carolina Insurance Guaranty Association, and it is further ordered that this Commission shall not enter any order granting any relief whatsoever against Union Asbestos and Rubber Company, the Debtors (as hereinafter defined), or any predecessor or successor of any of them, including without limitation, ROHN Industries, Inc.
8. By Order entered on July 14, 2003, the Industrial Commission found: "Prior to the date of hearing, the Full Commission was informed that counsel for Defendants' attorney, Gregory M. Willis, had stipulated to exposure in this case and had further stipulated to a set of medical records, and there would be no need for live testimony."
9. The issues before the Deputy Commissioner were:
 a) Whether decedent suffered from a compensable occupational disease and/or diseases and, if so, what disease(s).
 b) Whether decedent's occupational disease(s) had aggravated and/or accelerated any other non-occupational disease(s) and, if so, what disease(s).
 c) Whether plaintiff is entitled to recover the more munificent benefits under the Workers' Compensation Act and, if so, which provision thereof would allow plaintiff the more munificent remedy.
 d) Should plaintiff elect to recover benefits pursuant to N.C. Gen. Stat. § 97-31, which of decedent's organs were affected and what compensation should be awarded.
 e) Should Plaintiff elect to recover benefits pursuant to N.C. Gen. Stat. § 97-61.5 et seq.,
whether the provisions thereof apply to decedent.
 f) What total benefits, monetary and/or medical, plaintiff is entitled to receive, if any.
 g) Whether the compensation due plaintiff shall be increased by ten percent due to the disease being caused by the willful failure of defendant-employer to comply with any statutory requirement pursuant to N.C. Gen. Stat. § 97-12.
 h) Whether plaintiff shall be entitled to attorney fees for unreasonable defense of this matter.
 i) Whether there was any insurance coverage for the employer through the NCIGA.
10. The parties stipulated into evidence the following documents:
Social Security printout
Death Certificate
Letters Testamentary
Personnel Records of decedent
9. At the hearing, the parties introduced into evidence the following Exhibits:
 Exhibit 1: Plaintiff's Response to Defendant's First Set of Interrogatories and Request for Production of Documents
 Exhibit 2: Defendant's Response to Plaintiff's First Set of Interrogatories and Request for Production of Documents
 Exhibit 3: Medical Report by Dr. Douglas Kelling dated 9/20/96
 Exhibit 4: CT scan Report by Dr. Caroline Chiles dated 6/19/00
 Exhibit 5: CT scan Report by Dr. Edwin Newman dated 7/27/96
Exhibit 6: Medical records of Dr. Carl Nordstrom
 Exhibit 7: Chest x-ray Report from Stanley Memorial Hospital dated 3/12/99
Exhibit 8: Medical records of Dr. Christopher Mullins
Exhibit 9: Photograph of loom
10. Subsequent to the hearing, there were no expert depositions taken by the parties. The parties rely solely upon the stipulated medical reports as evidence in this case.
 * * * * * * * * * * *
Based upon all the competent credible and convincing evidence of record and the reasonable inferences arising therefrom, the Full Commission find the following:
 FINDINGS OF FACT
1. Decedent, Clonnie Wilson Thomas, died on August 26, 2000. He left behind his wife, Reba Preslar Thomas, who is the Executrix of his estate. Further, Reba Preslar Thomas is the sole and wholly-dependent widow of the deceased employee.
2. Decedent was exposed to the hazards of raw asbestos while employed by Unarco from 1949 to 1950. Decedent was injuriously exposed to asbestos as defined by N.C. Gen. Stat. § 97-57 during his employment with Unarco.
3. On July 27, 1996, Dr. Edwin Newman at Charlotte Radiology reviewed a CT scan taken of decedent, which was interpreted to show mild to moderate changes of interstitial fibrosis consistent with the etiology of asbestosis.
4. On September 20, 1996, decedent was diagnosed with "both asbestosis and asbestos-related pleural disease" after a respiratory evaluation by Dr. Douglas G. Kelling, Jr. In rendering his opinion, Dr. Kelling took into consideration a CT scan of decedent, pulmonary function testing results, a smoking history, physical examination of decedent, and a work history given by decedent that described his exposure to asbestos while employed by Unarco, as well as a past medical history of decedent.
5. Dr. Kelling reported that decedent was suffering from wheezing, chest tightness, and a productive cough.
6. On March 13, 1999, decedent went to Stanley Memorial Hospital complaining of shortness of breath, wheezing, coughing, and chest pain. He had been seen by Dr. Carl Nordstrom the previous day in his office and treated with nebulizers and Prednisone because of his history of asbestosis. After an examination, Christopher Mullins, D.O., again confirmed the diagnosis of asbestosis and noted that decedent's shortness of breath had become a recurrent problem.
7. On April 15, 1999, decedent was discharged from Stanley Memorial Hospital after treatment for pneumonia. Decedent had suffered from a cough, dyspnea, chest pain, and wheezing and was treated with aerosol, oxygen, and albuterol. During that treatment and time in the hospital, a chest x-ray was taken of decedent which was interpreted by Dr. Joseph Mallory, who reported seeing fibrosis. In the summary discharge notes, Dr. Nordstrom again concluded decedent suffered from pulmonary asbestosis.
8. On August 1, 2002, Dr. Caroline Chiles reviewed a CT scan taken of decedent dated June 19, 2000. Dr. Chiles found that the CT scan showed abnormalities consistent with fibrosis and could represent asbestosis in the appropriate clinical setting.
9. Decedent suffered from shortness of breath, wheezing, coughing, and chest pain from March 13, 1999, until the time of his death.
10. Decedent had not smoked cigarettes since approximately 1966, or 30 years ago.
11. Defendants have offered no medical evidence to contradict decedent's diagnosis of asbestosis and/or asbestos-related pleural disease.
12. Decedent developed asbestosis as a result of his employment with defendant-employer which employment placed him at an increased risk of developing asbestosis than members of the general public.
13. Decedent also suffered from asbestos related pleural disease as a result of his employment with defendant-employer which employment placed him at an increased risk of developing asbestos related pleural disease than members of the general public.
14. As a result of his asbestosis and asbestos related pleural disease, decedent suffered from an incurable and progressive lung disease until his death.
15. The lungs are vitally important internal organs that, unlike many other internal organs, are necessary to keep a human being alive and breathing.
16. As result of his exposure to asbestos while working for defendant-employer, decedent suffered permanent injury to both of his lungs as important internal organs.
17. On January 22, 2004, an Opinion and Award was issued in the case ofRay Benjamin Ketchie v. Carolina Stalite Company and the North CarolinaInsurance Guaranty Association (NCIGA), I.C. File No. 651706, which consolidated the issue of whether the NCIGA was responsible for certain asbestosis claims, including this claim. The NCIGA became obligated to pay this claim on January 17, 1989, as a result of American Mutual Liability filing for Chapter 11 Bankruptcy.
18. As stipulated by the parties, American Mutual Liability became insolvent prior to January 1, 1993.
19. In 1935, the General Assembly created the "Security Funds," as mechanisms for the payment of workers' compensation awards rendered against employers whose workers' compensation carriers had become insolvent. Established in Article 3 of Chapter 97, the Security Funds were financed by assessments of solvent stock and mutual workers' compensation insurance carriers transacting business in the State of North Carolina. The Commissioner of Insurance was entrusted with the responsibility of overseeing the funds. Once a carrier became insolvent, the Commissioner of Insurance would handle the claim in the place of the insolvent carrier and pay the claim, if necessary, from the appropriate account.
20. The Funds were comprised of two accounts, the Stock Fund Account and the Mutual Fund Account. The only difference between the two accounts was that the Stock Fund Account was for insolvent stock insurance carriers and the Mutual Fund Account was for insolvent mutual insurance carriers.
21. In 1971, the NCIGA was created by N.C. Gen. Stat. § 58-48-1 etseq. to maintain accounts for the payment of various types of claims on behalf of insolvent insurers. The NCIGA became responsible for various types of insurance, including home and automobile, but not workers' compensation. The purpose of the NCIGA, as identified in N.C. Gen. Stat. § 58-48-5, is to "provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. . . ." The NCIGA consists of "members" which are all property and casualty insurance companies licensed to do business in the State of North Carolina. N.C. Gen. Stat. § 58-48-20(6). The funding for the NCIGA's payment of claims is derived from (1) assessments or premiums from its members based upon the percentage of relevant business conducted in North Carolina, N.C. Gen. Stat. §§ 58-48-35(a) (3); (2) the proceeds of special deposits previously made by insolvent insurers, N.C. Gen. Stat. § 58-48-95; and (3) distributions from the estate of liquidation of an insolvent insurer to the extent it has made payments for permitted claims. N.C. Gen. Stat. § 58-48-50(b) and (c).
22. Before 1992, the Commissioner of Insurance continued to manage the Security Fund Accounts for insolvent workers' compensation carriers. However, the Security Funds were not adequately funded. The General Assembly thus decided to place the management of the Security Funds in the hands of the NCIGA. In 1992, the General Assembly enacted legislation amending the Insurance Guaranty Association Act ("IGAA") and the Workers' Compensation Act, to bring workers' compensation claims also within the scope of the IGAA and under the administration of the NCIGA. See
1991 N.C. Sess. Laws 802, § 6. Therefore, commencing January 1, 1993, the NCIGA became responsible for workers' compensation claims involving insolvent workers' compensation carriers.
23. When the legislative determination was made to shift responsibility for the workers' compensation funds from the Department of Insurance (hereinafter "DOI") to the NCIGA, the General Assembly considered whether or not to (a) fold the two Security Funds into a new fund so that there would only be one NCIGA workers' compensation fund or to (b) transfer the two Security Funds from the DOI to the NCIGA all the while keeping them separate from each other and adding a new workers' compensation account within the NCIGA. According to a memorandum dated June 10, 1992, sent from William R. Gilkeson, Counsel to the House Committee on Economic Expansion, the legislators compromised and agreed to combine the mutual and stock fund accounts into one account for all future claims (hereinafter "new account"), yet transfer monies from the Security Funds to the NCIGA maintaining the separate accounts to pay all then-current liabilities.
24. In short, after 1992, the NCIGA became responsible for workers' compensation claims against insolvent insurers. All remaining assets of the old Security Funds were placed in an account to be managed by the NCIGA. The NCIGA thus became statutorily required to maintain three distinct accounts: the separate stock and mutual fund accounts for then-current liabilities, and a new joint account for future claims. The stock and mutual fund accounts became a depository for funds maintained by the former Security Funds. As set forth in N.C. Gen. Stat. §58-48-105(a),
 [a]ll moneys received and paid into the Stock Workers' Compensation Security Fund under former G.S. 97-107, together with all property and securities acquired by and through the use of moneys belonging to this Fund, including interest earned upon moneys in this Fund, shall be transferred and deposited into a new account with the Association created pursuant to G.S. 58-48-115. This account shall be separate and apart from any other accounts similarly created and from all other Association funds. The Association shall be the custodian of the account, and shall administer the account in accordance with the provisions of this Article.
25. Further, N.C. Gen. Stat. § 58-48-105(b) provided for the identical transfer or disbursement of funds from the Mutual Workers' Compensation Security Fund codified at N.C. Gen. Stat. § 58-48-120. Therefore, the Security Funds were dissolved with the assets being transferred to the NCIGA to be maintained and managed. For ease of understanding, from this point forward, the old stock and mutual funds transferred to and currently managed and maintained by the NCIGA will be referred to as the "two old funds" or "old funds."
26. In accordance with N.C. Gen. Stat. § 58-48-125, the NCIGA is to use the two old funds "to pay the claims against insolvent stock workers' compensation insurers and insolvent mutual workers' compensation insurers, respectively, pursuant to N.C.G.S. 58-48-110(4) where theinsolvency occurred prior to January 1, 1993" (emphasis added). This purpose of the accounts is further emphasized in N.C. Gen. Stat. §58-48-110, which provides that the accounts created in the NCIGA pursuant to N.C. Gen. Stat. §§ 58-48-115 and 58-48-120 shall be used to (1) receive the balance of the former Security Funds, (2) receive assessments from members for any shortfalls of the Security Funds, (3) receive interest on the assets of the Funds, (4) pay for claims made against the securityfunds but only for claims existing prior to January 1, 1993, and (5) refund any funds remaining after all liabilities have been paid.
27. Since the legislators agreed to keep the two old funds separate from each other, as well as the new account, they had to create a demarcation line to distinguish which funds should pay particular claims. The demarcation line is based purely on the date of the insurance company's insolvency and the date when the claims "existed." Thus, all claims against carriers who were insolvent prior to January 1, 1993, and where the claims "existed" prior to January 1, 1993, are paid out of one of the two old funds transferred from the DOI to the NCIGA, whereas claims against carriers who became insolvent after the January 1, 1993, demarcation line would be paid out of the new account. The new account is a joint workers' compensation account wherein both mutual and stock fund carriers are assessed. Thus, the NCIGA currently administers three workers' compensation funds, which have different responsibilities depending on the date of the specific carrier's insolvency.
28. For all claims where the insolvency of the workers' compensation liability carrier occurred after 1993, the responsibility of the NCIGA is guided by N.C. Gen. Stat. § 58-48-20(4), wherein it is provided that:
 "Covered claim" means an unpaid claim, including one of unearned premiums, which is in excess of fifty dollars ($50.00) and arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Article applies as issued by an insurer, if such insurer becomes an insolvent insurer after the effective date of this Article.
(Emphasis added)
29. Therefore, in short, there are three accounts from which workers' compensation claims against insolvent carriers are paid by the NCIGA. The two old funds are to be used to pay claims where the insolvency occurred prior to 1993 and the claims "existed" prior to 1993. The new account pays workers' compensation claims where the carrier's insolvency occurred after 1993.
 * * * * * * * * * * *
Based upon the forgoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Decedent was last injuriously exposed to the hazards of asbestos dust while employed by defendant-employer, and for as much as thirty (30) days or parts thereof, within seven (7) consecutive months, which exposure proximately augmented his asbestosis. N.C. Gen. Stat. § 97-57.
2. Due to his injurious exposure to asbestos while employed with Unarco, decedent contracted the occupational diseases of asbestosis and asbestos related pleural disease. N.C. Gen. Stat. § 97-53.
3. The occupational diseases of asbestosis and silicosis are given exceptional treatment because of the progressive, insidious, and incurable nature of these diseases and the long latency period associated with asbestosis and silicosis. Payne v. Charlotte Heating AirConditioning, ___ N.C. App. ___, 616 S.E.2d 356, 363 (2005).
4. Plaintiff is entitled to receive the more munificent remedy available within the Act and to elect the greater benefits under N.C. Gen. Stat. §§ 97-31(24), 97-29, or 97-30.
5. Decedent is entitled to compensation for permanent injury to both lungs, which are important internal organs, due to his occupational exposure to asbestos. Further, the lungs are considered to be two separate organs. N.C. Gen. Stat. § 97-31(24).
6. Decedent's estate is entitled to have defendants pay for past medical expenses incurred as a result of decedent's asbestos related diseases which was required to monitor, provide relief, effect a cure, or lessen his period of disability. N.C. Gen. Stat. § 97-25.
7. The purpose of the Insurance Guaranty Association Act is set forth in N.C. Gen. Stat. § 58-48-5 wherein it provides that the role of the NCIGA is to help "avoid financial loss to claimants or policyholders because of the insolvency of an insurer. . . ." Thus, the goal of the IGAA and its sole purpose is to provide a safety net to claimants. Further, pursuant to N.C. Gen. Stat. § 58-48-5, the IGAA is to be "liberally construed to effect" this purpose. Therefore, the IGAA is set up to protect employees in workers' compensation claims and the statute is to be liberally construed to ensure that purpose. It is clear from the legislative history that the North Carolina legislature did not intend to exclude an entire group of workers' compensation claimants, latent occupational disease victims, from this protection.
9. N.C. Gen. Stat. § 58-48-35 mandates that a claim be filed during the time set by the court for filing claims against insolvent insurers. The Legislature did not consider latent disease claims when enacting this requirement. Latent disease claims are therefore an exception to this requirement.
10. Defendant-carrier, the North Carolina Insurance Guaranty Association, is obligated to pay this claim pursuant to N.C. Gen. Stat. § 58-48(1), et. seq. Decedent developed compensable latent occupational diseases which shall be paid from the old funds since the carrier became insolvent prior to January 1, 1993.
11. This claim is compensated out of the two old funds transferred from the DOI to the NCIGA, which are codified at N.C. Gen. Stat. §§ 58-48-115
and 120 and are currently in existence. The statutes that apply to the two old funds are N.C. Gen. Stat. §§ 58-48-105 to 58-48-130. N.C. Gen. Stat. §§ 58-48-115 and 120 allowed for assessments to be made to "all member insurers that are [stock or mutual fund] carriers writing workers' compensation . . . at the time of the assessment. . . ." Furthermore, according to N.C. Gen. Stat. § 58-48-130, the two old funds were not to be terminated until "all liabilities of the [two old funds were] satisfied" (emphasis added).
12. Decedent's widow, Reba Thomas, is conclusively deemed to be wholly dependent for support upon the deceased employee and entitled to all compensation awarded pursuant to N.C. Gen. Stat. §§ 97-37 and 97-39.
13. Defendant's prosecution of this matter was based upon reasonable grounds. Decedent is not entitled to reasonable fees for his attorney and costs pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For decedent's contraction of an occupational disease of asbestosis, defendant shall pay to his widow and executrix, Reba Thomas, $40,000.00 for the permanent injury to both of decedent's lungs, which are important internal organs. It shall be paid in a lump sum to his widow and executrix subject to an award of attorney's fee approved in paragraph 2.
2. As a reasonable attorney fee for prosecuting this matter, defendant shall pay to plaintiff's attorney 25% of the lump sum awarded in paragraph 1.
3. Defendant shall pay all costs.
This 21st day of March 2006.
 S/_______________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/________________________ DIANNE C. SELLERS COMMISSIONER